UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

HELINAUTICA INTERNACIONAL, S.A,
A Panamanian company,

    Plaintiff,

   v           CASE NO:

ENGAGE AVIATION, LLC, a Florida limited
liability company, PHILLIP J. CAREY, an
individual, and AERO-SPACE REPORTS,
INC., an Oklahoma corporation.

    Defendants.
_____/

## COMPLAINT

  Plaintiff Helinautica Internacional, S.A. (hereinafter, "Helinautica") sues the defendants

Engage Aviation, LLC ("Engage"), Phillip J. Carey ("Carey"), and Aero-Space Reports, Inc.

("ASR"), and alleges:

### Jurisdiction and Venue

  1.  Jurisdiction in this Court under 28 U.S.C. § 1 332 is based on the complete

diversity of the parties.  The plaintiff is a Panamanian company, two defendants are residents of

Florida, and one defendant is a resident of Oklahoma.   The amount in controversy exceeds

$75,000 exclusive of interest and costs.

  2.  Venue in this Court is proper under 28 U.S.C. §1391 because two defendants are

citizens of the state of Florida and within this judicial district.

### Nature of the Case

  3.  This is a civil action against defendants for individually and collectively depriving

Helinautica of Two Hundred and Fifty Thousand Dollars ($250,000) in commissions,

{TP695162;2}

consultancy fees, and brokerage fees, and causing other damages to the plaintiff. Helinautica's claims arise from its role in the purchase of two aircraft by Consorcio Venezolano de Industrias Aeronáuticas y Servicios Aéreos d/b/a Conviasa Airlines (hereinafter, "Conviasa"), a state-owned airline with its headquarters in Maiquetía, Venezuela, from Air One S.p.A. (hereinafter "Air One"), a wholly owned subsidiary of Alitalia S.p.A., an airline with its headquarters in Rome, Italy. In this complaint, Helinautica avers that it was damaged by the individual and collective actions of the defendants.

## The Parties

4.     Helinautica is a Panamanian company that performs services, among other things, as an international aircraft broker with its principal place of business in Caracas, Venezuela.

5.     Engage is an international aircraft broker incorporated in the state of Florida, with its principal place of business in Sarasota, Florida.

6.     Carey is a resident of the city of Sarasota, Florida, and the President and sole owner of Engage. At all times relevant to this complaint, Carey was the sole representative and spokesperson for Engage.

7.     ASR is an Oklahoma corporation with its principal place of business in Oklahoma City, Oklahoma and which is actively engaged in business in the state of Florida.

## Factual Background

### I.     The Agreements

#### A.     The Commission Agreement

8.     In the fall of 2009, Engage and Carey, representing Air One, offered for sale two used Boeing 737-200 aircraft, manufacturers serial numbers 23153 and 23158, and a spare engine for the two aircraft (hereinafter collectively the "Aircraft") allegedly owned by Air One.

9.      Engage and Carey engaged Helinautica to serve as its representative in Venezuela to broker an agreement with Conviasa, to buy the Aircraft.

10.     Engage and Carey agreed to pay Helinautica Five Hundred Thousand Dollars ($500,000) for its services (the "Commission Agreement"). This fee was to be paid in two installments. The payments to Helinautica and Engage for their services related to the sale of the Aircraft were to be made from Conviasa's total payment of the full Purchase Price (as defined herein) for the Aircraft.

11.     This Commission Agreement is memorialized by two letters from Engage/Carey to Helinautica, dated October 19, 2009 and December 29, 2009. True and correct copies of these letters are attached to this Complaint as **Composite Exhibit "A."**

**B.      The LOI**

12.     On or about November 30, 2009, Engage, on behalf of Air One, and Conviasa entered into a Letter of Intent (hereinafter, "LOI") that served as the contract for the purchase and sale of the Aircraft. A true and correct copy of the LOI is attached to this Complaint as **Exhibit "B."**

13.     Engage/Carey also sent an addendum to Conviasa purportedly clarifying certain terms of the LOI. A true and correct copy of the addendum is attached hereto as **Exhibit "C."**

14.     Engage/Carey would not have been able to negotiate and sell the Aircraft to Conviasa or obtain government approval to do so without the intervention and assistance of Helinautica in Venezuela.

**C.      The Escrow Agreement**

15.     ASR agreed to act as the escrow agent for the transaction pursuant to an escrow agreement (the "Escrow Agreement"), a true and correct copy of which is attached hereto as

Exhibit "D." The Commission Agreement, LOI, and Escrow Agreement, as supplemented and amended, are hereafter referred to collectively as the "Agreements."

## II.   The Pertinent Terms of the Agreements

16. Conviasa agreed to buy the Aircraft in airworthy condition for a purchase price of Two Million Seven Hundred Thousand Dollars ($2,700,000) (hereinafter, the "Purchase Price"). The Purchase Price was allocated as Two Million Dollars ($2,000,000) for the Aircraft (hereinafter the "Aircraft Price"), of which Five Hundred Thousand Dollars ($500,000) was to be paid to Helinautica. The Agreements do not specifically state the total amount to be paid to Air One or Engage for its services to act as Air One's agent and/or Conviasa's representative for purposes of providing maintenance management and support services in the transaction.

17. Seven Hundred Thousand Dollars ($700,000) of the Purchase Price was estimated and allocated for the maintenance work required to return the Aircraft to airworthy condition according to Venezuelan aviation regulations 121, 91, 39 and 43, and its equivalent U.S. Federal Aviation Regulations (hereinafter "Rehabilitation Costs"). The amount set aside for Rehabilitation Costs is based on the estimate for such costs stated in the addendum to the LOI attached hereto as Exhibit "C."

18. The Rehabilitation Costs are defined in the scope of work as outlined in Appendix 1 to the LOI (hereinafter, the "Workscope"), which, on information and belief, was prepared by an agent of Engage. Engage was responsible for delivering the spare parts outlined in the Workscope. No spare parts other than as outlined in the Workscope were to be included in the Purchase Price.

19. Under the LOI, Engage agreed to: a) act as Conviasa's exclusive representative to provide maintenance management and support during the entire sales and delivery process; b)

pay for the technical reactivation of the Aircraft, defined as preparing the Aircraft for safe flight (hereinafter, "Reactivation"); and c) manage the work to ferry the Aircraft from Rome and to deliver them to Pacific Aerospace Resources and Technologies, LLC (hereinafter, "Pacific Aerospace"), an aircraft maintenance facility in Victorville, California.

20.      Although not specifically set forth in the Agreements, upon information and belief, the fees to be paid to Engage for their services under the LOI and related to the purchase and sale of the Aircraft would have been approximately $300,000 to $350,000.

21.      Pacific Aerospace was to provide the services necessary to make the Aircraft airworthy under the management and direction of Engage/Carey and in accordance with the Federal Aviation Administration ("FAA").

22.      In addition to the Purchase Price, Conviasa agreed to pay: a) all costs for the Engineer/FAA DAR (Designated Airline Representative) inspection in order to prepare the Aircraft for the ferry flight to Pacific Aerospace; and b) the costs of ferrying the Aircraft from Rome to Pacific Aerospace's facilities in California, including providing pilots, expenses, and fuel for the flights.

23.      To facilitate the transfer of the Aircraft, Engage agreed to purchase the Aircraft in its own name in trust for Conviasa and then to transfer title to Conviasa when the Aircraft became airworthy.

24.      The costs to ferry the Aircraft to Pacific Aerospace was estimated by Engage/Carey's agent and representative to be between Seventy-Five to Eighty-Five Thousand Dollars ($75,000 - $85,000) including crew, fuel, landing fees, etc.

25.      The Purchase Price was to be deposited into an escrow account controlled by ASR. The sums in the escrow account were then to be distributed in accordance with instructions

to be forthcoming from Carey and Conviasa. No detail is contained in the Agreements regarding to whom payments are to be made and when. The LOI states only that the release of funds from escrow is to be made at the following times: a) One Million Five Hundred Thousand Dollars ($1,500,000) released upon Engage granting Conviasa a bill of sale; b) Six Hundred Thousand Dollars ($600,000) upon the Aircraft entering the Pacific Aerospace facility; and c) Six Hundred Thousand Dollars ($600,000) upon Conviasa accepting final delivery of the Aircraft.

### III. <u>Performance and Breach of the Agreements</u>

26.     Conviasa deposited the full Purchase Price of Two Million Seven Hundred Thousand Dollars ($2,700,000) into escrow on December 17, 2009.

27.     On December 29, 2009, Carey directed ASR, and confirmed to Helinautica in accordance with the Commission Agreement, Exhibit "A", that commissions were to be paid to Helinautica from the escrow account as follows:

> "$250,000 once both aircraft arrive at the maintenance facility in Victorville, California" and
> "$250,000 once both aircraft are delivered and ready to depart Victorville, California"

This Commission Agreement also included a provision that:

> "... any cost overruns that Conviasa deems are the responsibility of Engage Aviation will be shared equally between Helinautica and Engage Aviation and deducted from the second payment."

28.     Engage and Carey's efforts to reactivate the Aircraft for the ferry flights from Rome, Italy to Pacific Aerospace ran into problems almost immediately after the LOI was signed and resulted in delays and additional costs not contemplated under the LOI.

29.     Engage/Carey was required to deregister the Aircraft from the Italian registry and register the Aircraft with the FAA. To accomplish this, the insurance coverage for the Aircraft had to be changed from Air One to Conviasa with Engage as an additional insured. Engage and

Carey failed to request that Conviasa instruct its insurance agent to make the required change promptly. The request was not made until sometime in January 2010.

30.     An additional problem arose for Engage/Carey when they discovered after execution of the LOI that Air One did not have sole and clear title to the Aircraft. Rather, the Aircraft were owned, in part, by an Irish company, whose position had to be cleared. This lack of clear title to the Aircraft and Engage and Carey's unawareness of this cloud on their title added significant delay to Engage meeting its obligations under the LOI.

31.     Engage/Carey did not have the Reactivation work performed by Lufthansa Technique, as required by the LOI. Rather, Engage/Carey rented facilities from Air One and hired technicians contracted in Venezuela for the work. Engage/Carey also used Air One's insurance that covered movement of the Aircraft from storage and ground work on the Aircraft. These actions were taken without Conviasa's approval and significantly increased the cost of Reactivation (which was to be born by Engage under the LOI).

32.     On information and belief, Reactivation work and rental expenses were paid from escrow and thereby reduced the available funds in the escrow for the Rehabilitation work.

33.     Carey purchased numerous spare parts for the Aircraft that were not included in the Workscope and attempted to sell those parts to Conviasa. On information and belief, Carey used money from escrow to purchase these parts. Conviasa declined to purchase the additional spare parts leaving less funds in escrow to pay for the Rehabilitation Costs.

34.     On February 4, 2010, Carey confirmed to Helinautica that ASR had received the entire Purchase Price from Conviasa. Carey reported to Helinautica that he had instructed ASR to disburse the first Two Hundred Fifty Thousand Dollars ($250,000) payment to Helinautica. Carey also reported that he had already instructed ASR to make the second Two Hundred Fifty

Thousand Dollars ($250,000) payment to Helinautica in accordance with the agreement between the parties. This report was false because these instructions were not actually given to ASR until February 19, 2010.

35.     Between December 30, 2009 and March 16, 2010, Carey directed ASR to make payments out of the escrow to Air One for the Aircraft and also to make payments to various suppliers. At Carey's direction, several payments were made from the escrow to suppliers of goods and services related to Reactivation and also for ferry expenses. These goods and services were solely the responsibility of Conviasa and Engage under the LOI and should not have been paid with funds from the escrow allocated for Rehabilitation Costs.

36.     On January 25, 2010, Engage/Carey directed the release by ASR of One Million Eighty Thousand Dollars ($1,080,000) from escrow to Air One in payment for the Aircraft.

37.     On or about February 9, 2010, Carey submitted invoices to Conviasa for direct payment to Engage and not through the escrow account. These invoices were intended to require Conviasa to pay for those goods and services necessary for Reactivation and ferrying to Pacific Aerospace's facilities in California. Conviasa was not, however, responsible for Reactivation, which was Engage's responsibility under the LOI.

38.     When Conviasa complained about the invoices and demanded an explanation, Carey claimed to have spent over Three Hundred Thousand Dollars ($300,000) for maintenance costs, preparing the Aircraft for flight, and ferry expenses.

39.     On information and belief, Engage/Carey was paid the Three Hundred Thousand Dollars ($300,000) by Conviasa directly and not through the escrow.

40.     On February 19, 2010, Carey instructed ASR to release the second Two Hundred Fifty Thousand Dollars ($250,000) payment to Helinautica when the second $600,000 is released from escrow.

41.     By letter dated February 19, 2010, ASR acknowledged to Helinautica that it had received Carey's instructions regarding release of both the initial payment of Two Hundred Fifty Thousand Dollars ($250,000) and the second payment of the additional Two Hundred Fifty Thousand Dollars ($250,000) to Helinautica.  Attached hereto as **Composite Exhibit "E"** are true and correct copies of the letters dated February 19, 2010 from ASR to Helinautica and Engage/Carey.

42.     By letter dated February 20, 2010, Carey reported that both Aircraft were deregistered and ready to leave Rome for the Pacific Aerospace facilities in California.

43.     On March 10, 2010, Carey told Helinautica that the Aircraft had arrived at Pacific Aerospace and were undergoing preliminary inspections. He again complained that he had incurred additional expenses because of "technical problems."

44.     Pacific Aerospace had presented Engage with an invoice dated January 15, 2010 for Sixty Three Thousand Dollars ($63,000) for expenses related to its travel to Rome to inspect the Aircraft and to obtain permits that would allow it to perform the required engineering services to make the Aircraft airworthy. That invoice was paid by Conviasa directly and not from any escrow deposit. The invoice was not paid by Engage.

45.     On or about March 16, 2010, the first Two Hundred Fifty Thousand Dollar ($250,000) payment was made to Helinautica from escrow.

46.     Also on that date, approximately Three Hundred Fifty Thousand Dollars ($350,000) was paid from escrow to Engage.

47.     As of March 16, 2010, there were insufficient funds remaining in escrow to pay Pacific Aerospace for that company to begin work on the Aircraft. Moreover, Engage had never delivered to Pacific Aerospace the spares and other parts required to do the work as required by the Workscope.

48.     On information and belief, no additional work has been done by Pacific Aerospace since the Aircraft's arrival at its facility to make the Aircraft airworthy under FAA standards. Although flyable, the Aircraft remained in storage at the Pacific Aerospace facility in Victorville, California.

49.     On June 18, 2010, the remaining funds in the escrow were distributed as follows at Carey's direction and with Conviasa's approval:

| Alitalia/Air One | $105,217.68 |
|------------------|-------------|
| Engage/Carey     | $350,413.49 |
| Conviasa         | $140,703.83 |
| ASR              | $ 3,665.00  |

These funds were distributed without prior or even subsequent notice to Helinautica by either Engage/Carey or ASR.

50.     In total, Engage/Carey has received a total of Eight Hundred Forty Seven Thousand Forty Dollars and Eighty One Cents ($847,040.81) from the escrow account, at least Four Hundred Fifty-Five Thousand Six Hundred Thirty One Dollars and Seventeen Cents ($455,631.17) of which were payments for its services and not for Rehabilitation Costs.

51.     In addition, Engage/Carey's agent and representative that performed some of the services under the LOI, received additional payments totaling Fifty Seven Thousand Two Hundred Dollars ($57,200) from the escrow account.

52.     The total payments to Engage/Carey and their agents and representatives for fees for their services far exceed the amounts contemplated to be paid to Engage/Carey under the Agreements.

53.     On information and belief, Engage/Carey holds title to the Aircraft. Although held in trust for Conviasa, Engage/Carey is attempting to sell the Aircraft to other airlines. One of the potential buyers of the Aircraft is an airline that competes with Conviasa in Venezuela.

54.     Helinautica has never received the second Two Hundred Fifty Thousand Dollars ($250,000) payment for its services to which it was entitled under the Commission Agreement with Engage/Carey.

55.     Helinautica performed all conditions precedent required to be performed prior to bringing this action and/or all conditions precedent have occurred or been waived.

## Count I
## Breach of Contract
## (Against Engage)

56.     Helinautica herein repeats and incorporates each of the allegations in paragraphs 1 through 55 above as if fully set forth herein.

57.     In the Commission Agreement between Engage and Helinautica, Engage promised to pay Helinautica Five Hundred Thousand Dollars ($500,000) as commission, consultancy fees, and brokerage fees if it was able to arrange the sale of the Aircraft to Conviasa.

58.     Helinautica, relying on the promise of Engage, performed its obligations under the Commission Agreement. As a result of Helinautica's performance in accordance with the

Commission Agreement, Conviasa agreed to purchase the Aircraft on terms acceptable to Engage, which was acting on behalf of Air One.

59.     For its services, Engage has paid Helinautica only Two Hundred Fifty Thousand Dollars ($250,000).

60.     Despite Helinautica's demand for payment, Engage has refused, and continues to refuse to pay Helinautica the Two Hundred Fifty Thousand Dollars ($250,000) to which it is entitled.

61.     Engage's refusal to honor its agreement to pay Helinautica the full amount to which it is entitled for its services is a breach of contract for which Helinautica has been damaged.

WHEREFORE, Helinautica requests an award of damages from Engage in an amount of at least Two Hundred Fifty Thousand Dollars ($250,000) plus interest and costs and such other and further relief as is appropriate.

## Count II
### Breach of Third Party Beneficiary Contract
### (Against Engage and ASR)

62.     Helinautica herein repeats and incorporates each of the allegations in paragraphs 1 through 55 above as if fully set forth herein.

63.     Helinautica is not a party to the LOI and the Escrow Agreement.  However, the parties to the LOI and Escrow Agreement intended the LOI and Escrow Agreement to directly benefit Helinautica by payment of the sum of Five Hundred Thousand Dollars ($500,000) from the funds in the escrow account.

64.     Helinautica's performance under the Commission Agreement with Engage was essential for Engage to be able to sell the Aircraft to Conviasa on behalf of Air One.

65.     Engage and ASR's proper management of the escrow created under the LOI and the Escrow Agreement was required for Helinautica to be paid its commission.

66.     Because of Engage's commitment to Helinautica and ASR's knowledge and acceptance of those commitments, Helinautica is a third party beneficiary of the LOI and the Escrow Agreement.

67.     Helinautica has only received Two Hundred Fifty Thousand Dollars ($250,000) from the escrow.

68.     Engage breached the LOI and Escrow Agreement through its misuse of funds from the escrow for its own benefit and those of others and its failure to pay Helinautica the agreed amount for its services.

69.     ASR breached the Escrow Agreement by releasing funds contrary to the terms of the Escrow Agreement and without notice to Helinautica.

70.     The Escrow Agreement provides that attorneys' fees are required to be paid to ASR in the event of a dispute.

71.     Helinautica has engaged the services of the undersigned lawyers and law firms and has agreed to pay them a reasonable fee for their services.

72.     Pursuant to the Escrow Agreement and Florida Statute § 57.105, Helinautica is entitled to its attorneys' fees and costs for bringing this action.

73.     As a result of Engage and ASR's breaches of the LOI and Escrow Agreement, to which Helinautica was a third party beneficiary, Helinautica has been damaged.

WHEREFORE, Helinautica requests an award of damages from Engage and ASR in an amount of at least Two Hundred Fifty Thousand Dollars ($250,000) plus interest, attorneys' fees, and costs and such other and further relief as is appropriate.

## Count III
## Negligent Misrepresentation
## (Against Engage)

74.     Helinautica herein repeats and incorporates each of the allegations in paragraphs 1 through 55 above as if fully set forth herein.

75.     Under the terms of the LOI, Engage agreed to act as Conviasa's exclusive agent to provide maintenance management and support during the entire delivery process.

76.     Engage, acting through its agent, conducted an inspection of the Aircraft before offering the Aircraft for sale to Conviasa.

77.     Engage represented to Helinautica and Conviasa that the Aircraft could be made airworthy for a total engineering expense of Seven Hundred Thousand Dollars ($700,000) (Rehabilitation Costs) plus the costs of Engineer/FAA DAR and ferry expenses as set forth in the LOI.

78.     On information and belief, Engage represented to Helinautica and Conviasa that Air One had clear title to the Aircraft. This was not true because other persons had an interest in the Aircraft.

79.     Engage had a duty to represent the condition and ownership of the Aircraft fairly and accurately to Helinautica and Conviasa.

80.     Engage knew or should have known that its representations regarding the estimate for Rehabilitation Costs and title to the Aircraft were false.

81.     Helinautica, having been hired by Engage to facilitate the transaction with Conviasa in Venezuela, had a right to rely on the representations made by Engage as to the condition and ownership of the Aircraft and to use those representations to convince Conviasa to move forward with the transaction.

82.     Helinautica, having been hired by Engage to facilitate the transaction with Conviasa in Venezuela, reasonably and justifiably relied on the representations by Engage as to the condition and ownership of the Aircraft because it was to receive the full amount of its commission from the funds in the escrow account. Only Seven Hundred Thousand Dollars ($700,000) from the escrow account were to be used to pay for the Rehabilitation Costs to make the Aircraft airworthy.

83.     As a direct and proximate result of Engage's negligent misrepresentations to Helinautica and Conviasa, Helinautica's reputation has been damaged. Helinautica is entitled to damages in an amount of at least One Million Dollars ($1,000,000) and has suffered a direct loss of income of at least Two Hundred Fifty Thousand Dollars ($250,000) plus interest and costs for which Engage is liable.

WHEREFORE, Helinautica request an award of damages, interest, costs and such other and further relief as is appropriate.

### Count IV
### Conversion
### (Against Engage and Carey)

84.     Helinautica herein repeats and incorporates each of the allegations in paragraphs 1 through 55 above as if fully set forth herein.

85.     Under the terms of the LOI, Engage agreed to act as Conviasa's exclusive representative to provide maintenance management and support during the entire delivery process.

86.     Carey represented that his qualifications and experience in the aviation industry qualified Engage as a reputable company and qualified Engage to provide maintenance management and support.

87.     Because of this relationship, Conviasa reasonably and justifiably relied on Engage and Carey to accurately represent the costs to make the Aircraft airworthy and the estimated ferry charges. Conviasa also relied on Engage and Carey to manage the Purchase Price money it placed into escrow as payment for the Aircraft and to manage and supervise the return of the Aircraft to airworthy condition.

88.     Because of its relationship with Engage and Carey to procure and facilitate the sale to Conviasa, Helinautica reasonably and justifiably relied on Engage and Carey's representations regarding Carey's qualifications and experience and reasonably and justifiably relied on Engage and Carey to use the Purchase Price money deposited in the escrow properly as authorized by the LOI in order to have funds available for payment to Helinautica for its services.

89.     Engage and Carey, without proper authority, misused the funds in the escrow to pay for Reactivation expenses for which Engage was solely responsible.

90.     Engage and Carey, without proper authority, misused the funds in the escrow to pay for spare parts that Engage purchased.

91.     Engage and Carey, without proper authority, misused the funds in the escrow to pay Engage at least Four Hundred Fifty-Five Thousand Six Hundred Thirty One Dollars and Seventeen Cents ($455,631.17), far in excess of the amounts it was contemplated to receive under the Agreements.

92.     Engage and Carey, without proper authority, misused the funds in the escrow by directing total payments to Engage of Eight Hundred Forty Seven Thousand Forty Dollars and Eighty One Cents ($847,040.81) for its services and unwarranted expenses.

93.     Helinautica was entitled to be paid two payments of Two Hundred Fifty Thousand Dollars ($250,000) from the escrow account. Helinautica did not receive the second payment of Two Hundred Fifty Thousand Dollars ($250,000).

94.     Upon payment of the Purchase Price by Conviasa, Helinautica had a vested right to the full payment of the full amount of its commission and was deprived of this vested right by Engage and Carey.

95.     Engage and Carey's use of the funds in the escrow account for Engage's benefit and the unwarranted benefit of others deprived Helinautica of its commission and constituted a conversion of those funds for Engage and Carey's wrongful purposes.

96.     As a direct and proximate result of Engage and Carey's conversion of funds in the escrow account, Helinautica has been damaged by a direct loss of income of at least Two Hundred Fifty Thousand Dollars ($250,000) plus interest and costs.

WHEREFORE, Helinautica requests an award of damages, interest, costs and such other and further relief as is appropriate.

### Count V
### Negligent Misrepresentation
### (Against Carey)

97.     Helinautica herein repeats and incorporates each of the allegations in paragraphs 1 through 55 and 75 through 83 above as if fully set forth herein.

98.     Carey is the 100% owner, President, and sole manager of Engage.

99.     Carey is the sole representative of Engage in its dealings and relationships with other persons or entities.

100.     Engage's website touts Carey's experience in the aviation industry and calls Engage a "re-brand" of Carey's prior company.  Because of his qualifications and experience in

the industry, Carey knew or should have known that his representations regarding Rehabilitation Costs, estimated ferry costs, reactivation expenses, and title were false.

101.   Helinautica at all times understood that its relationship with Engage was, in reality, a relationship with Carey. In agreeing to facilitate Conviasa's purchase of the Aircraft, Helinautica reasonably and justifiably relied on Carey's personal qualifications and experience regarding the condition of the Aircraft, title to the aircraft and estimates for Rehabilitation costs and ferry costs.   In turn, Helinautica negotiated the sale with Conviasa based on those representations.   Helinautica also reasonably and justifiably relied on Carey's representations that it would receive the full amount of the agreed commissions.

102.   On information and belief, Engage does not have sufficient capital to be responsible for its actions or to meet its obligations.

103.   On information and belief, Engage was dominated and controlled by Carey and all representations made by it where Carey's representations.

104.   As a direct and proximate result of Carey's negligent misrepresentations, Helinautica's reputation has been damaged.   Helinautica is entitled to damages in an amount of at least One Million Dollars ($1,000,000) and a direct loss of income of at least Two Hundred Fifty Thousand Dollars ($250,000) plus interest and costs for which Carey is personally liable.

WHEREFORE, Helinautica requests an award of damages, interest, costs and such other and further relief as is appropriate.

### Count VI
### Breach of Fiduciary Duty
### (Against ASR)

105.   Helinautica herein repeats and incorporates each of the allegations in paragraphs 1 through 55 above as if fully set forth herein.

{TP695162;2}                                       18

106. ASR was aware of and expressly acknowledged Engage/Carey's commitment to pay Two Hundred Fifty Thousand Dollars ($250,000) to Helinautica as the second payment for Helinautica's services. *See* **Exhibit "D".**

107. Helinautica reasonably relied on and reposed trust in ASR based upon ASR's express acknowledgement of the payments to Helinautica for Helinautica's services, without which no sales agreement for the Aircraft could have been made between Engage/Carey, on behalf of Air One, and Conviasa.

108. Helinautica was a third party beneficiary of the Escrow Agreement between and among ASR, Engage, and Conviasa.

109. ASR, by its express acknowledgment to Helinautica, by letters dated February 19, 2010, accepted the trust and confidence reasonably reposed in it by Helinautica and assumed a duty to advise, counsel and protect Helinautica, prior to the release of the final Six Hundred Thousand Dollars ($600,000) from escrow.

110. ASR had a fiduciary duty to Helinautica to preserve the assets in the escrow agreement in order to have sufficient funds to pay Helinautica the second payment of Two Hundred Fifty Thousand Dollars ($250,000).

111. ASR had a fiduciary duty to Helinautica and others to ensure that the provisions of the Escrow Agreement were properly followed to address the intentions and reasonable expectations of all parties involved in the transaction.

112. ASR was aware or should have been aware of the necessity to preserve Seven Hundred Thousand Dollars ($700,000) in the escrow account to pay for the engineering services in accordance with the Workscope to make the Aircraft airworthy in order for the Aircraft to be delivered to Conviasa.

113.   ASR was aware or should have been aware that releasing all the funds in the escrow account to Engage and others that had been contracted by Carey (but not to Helinautica) would deprive Helinautica of a payment of Two Hundred Fifty Thousand Dollars ($250,000) for its services.

114.   ASR was aware or should have been aware that releasing all the funds in the escrow account to Engage and suppliers other than Pacific Aerospace would eliminate the possibility that the Aircraft could be made airworthy.

115.   Notwithstanding ASR's knowledge of the unlawful effects of following Carey's directions regarding the disposition of all remaining funds from the escrow account, ASR made payments to Engage and others that deprived Helinautica of the benefits of its agreement with Carey/Engage.

116.   On information and belief, Conviasa never deemed any cost overruns to be the responsibility of Engage. Therefore, ASR never determined the amount of any such overruns to be shared equally between Helinautica and Engage. This was a specific violation of the direction given ASR by Engage on or about December 29, 2009.

117.   ASR had a fiduciary duty to inform Helinautica prior to making payments of all the remaining funds in the escrow account.

118.   The Escrow Agreement provides that attorneys' fees are required to be paid to ASR in the event of a dispute.

119.   Helinautica has engaged the services of the undersigned lawyers and law firms and has agreed to pay them a reasonable fee for their services.

120.   Pursuant to the Escrow Agreement and Florida Statute § 57.105, Helinautica is entitled to its attorneys' fees and costs for bringing this action.

121.    As a direct and proximate result of ASR's breach of its fiduciary duty in releasing all the funds in the escrow account, third party beneficiary Helinautica has been damaged by a direct loss of income of at least Two Hundred Fifty Thousand Dollars ($250,000) plus interest, attorneys' fees, and costs for which ASR is liable.

WHEREFORE, Helinautica requests an award of damages, interest, attorneys' fees, costs and such other and further relief as is appropriate.

### Count VII
### Conspiracy to Defraud
### (Against Engage, Carey, and ASR)

122.    Helinautica herein repeats and incorporates each of the allegations in paragraphs 1 through 55 above as if fully set forth herein.

123.    Through their actions individually and collectively, Engage, Carey, and ASR intentionally agreed and conspired to deprive Helinautica and others of the benefits of the agreements made regarding the purchase of the Aircraft by Conviasa.

124.    The collective actions of Engage, Carey, and ASR to convert and otherwise misuse the funds placed in escrow in accordance with the LOI constitute a conspiracy to defraud Helinautica to its serious detriment.

125.    As a direct and proximate result of this conspiracy to defraud Helinautica by misusing the funds in the escrow account, Helinautica has been damaged by a direct loss of income of at least Two Hundred Fifty Thousand Dollars ($250,000) plus interest and costs for which Engage, Carey, and ASR are individually and collectively, and jointly and severally liable.

WHEREFORE, Helinautica requests an award of damages, interest, costs and such other and further relief as is appropriate.

## Count VIII
## Accounting
## (Against Engage and ASR)

126.   Helinautica herein repeats and incorporates each of the allegations in paragraphs 1 through 55 above as if fully set forth herein.

127.   As set forth above, Engage and ASR are fiduciaries to Helinautica with regard to the amounts paid in escrow.

128.   The Agreements are interrelated and describe a complex transaction for the purchase and sale of Aircraft for which a commission was to be paid to Helinautica.

129.   Conviasa and Helinautica fully performed their obligations under the Agreements.

130.   Payments were made from escrow without explanation as to whether the payments were for Reactivation, ferry costs, Rehabilitation Costs, and fees and costs payable to Engage for its services under the agreements.

131.   Helinautica, because it was deprived of the second payment due to it under the Commission Agreement after fully performing its obligations, is due an accounting from Engage and ASR.

132.   Without an accounting, Helinautica has no adequate remedy at law because it will not have knowledge as to how Engage and ASR accounted for any possible cost overruns, and to what extent Engage improperly assessed and deduced cost overruns from the second payment of $250,000 that Helinautica is entitled to under the Commission Agreement.

WHEREFORE, Plaintiff respectfully requests that this Court enter judgment against Engage and ASR for an equitable accounting and costs, and such other and further relief as the Court deems just and proper.

## PRAYER FOR RELIEF

Based on the above allegations, Helinautica herein prays for an award of damages in the minimum amount of Two Hundred Fifty Thousand Dollars ($250,000), an additional award of at least One Million Dollars ($1,000,000) for lost revenue and loss of reputation, plus interest, attorneys' fees, and costs, and such other and further relief as the court deems just and proper.

## JURY DEMAND

Plaintiff demands a trial by jury on all triable issues.

Date: _march 30, 2011_

_Irene Bassel Frick_
Irene A. Bassel Frick
Florida Bar No.: 0158739
Benjamin Diamond
Florida Bar No.: 089921
Akerman Senterfitt
401 E. Jackson Street, Suite 1700
Tampa, Florida 33602
Phone: (813) 223-7333
Facsimile: (813) 223-2837
E-Mail:  irene.bassel@akerman.com
            benjamin.diamond@akerman.com

Pro Hac Vice Counsel:
Paul M. Tschirhart
Margulies Wind P.C.
Harborside Financial Center
Plaza 10
Suite 1201
3 Second Street
Jersey City, NJ 07311-3988
201-722-1100

_and_

Allan Mendelsohn
Of Counsel,
Cozen O'Connor
1627 I Street, NW
Suite 1100
Washington, D.C. 20006